WILKINSON, Circuit Judge, dissenting:
 

 Once upon a time, now seemingly a geologic age ago, the federal judiciary appeared sold on the inherent advantages that trial courts and trial juries bring to fact-finding in our criminal justice system. No longer. My colleagues in the majority ably demonstrate that application of the categorical approach to
 
 18 U.S.C. § 924
 
 (c)(3)(B) saddles that statute with a fatal constitutional infirmity. My colleagues in dissent-whom I join-ably demonstrate why that infirmity need not exist; the better reading of the statute avoids it by applying the case-specific approach in place of the categorical. I write separately to further explain how application of the categorical approach here is part of a troubling trend: the gratuitous conversion of issues of fact into questions of law; the usurpation of authority by appellate courts and the resultant atrophy of trial courts' fact-finding function.
 

 * * * *
 

 Appellate courts have taken the Sentencing Guidelines and the categorical approach to crimes of violence as an invitation to wade deep into sentencing. This despite the faith that
 
 Gall v. United States
 
 placed in district judges with respect to the sentencing function.
 
 552 U.S. 38
 
 ,
 
 128 S.Ct. 586
 
 ,
 
 169 L.Ed.2d 445
 
 (2007). There is no mistaking
 
 Gall
 
 's thrust: district judges are "in a superior position to find facts," and, because of this, appellate judges must give them "due deference."
 

 Id.
 

 at 51
 
 ,
 
 128 S.Ct. 586
 
 . The district judge has "greater familiarity with[ ] the individual case and the individual defendant before him than the ... appeals court."
 
 Id
 
 . at 51-52,
 
 128 S.Ct. 586
 
 . Unlike the appeals court, the district "judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insight not conveyed by the record."
 

 Id.
 

 at 51
 
 ,
 
 128 S.Ct. 586
 
 . In short, "district courts have an institutional advantage over appellate courts" in setting sentences.
 

 Id.
 

 at 52
 
 ,
 
 128 S.Ct. 586
 
 .
 

 Because of this institutional advantage-that district judges have the eyes and ears that appellate judges lack-
 
 Gall
 
 commanded appeals courts to apply a "deferential abuse-of-discretion" standard to critical sentencing determinations.
 

 Id.
 

 This standard, when combined with the clearly-erroneous standard for findings of fact, should have instilled in us a proper respect for the trial courts' basic judgment calls.
 

 Id.
 

 at 51
 
 ,
 
 128 S.Ct. 586
 
 . The
 
 Gall
 
 Court underscored this point when it wrote that "[t]he fact that the appellate court might reasonably
 have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."
 

 Id.
 

 at 51
 
 ,
 
 128 S.Ct. 586
 
 .
 

 One would think that
 
 Gall
 
 fixed principal responsibility for sentencing where it belonged: with the trial courts. After all, that case simply reflected the basic principle that sentencing is a fact-bound matter which requires the exercise of wide discretion by trial judges. Landmark cases such as
 
 Gall
 
 and
 
 Anderson v. City of Bessemer City
 
 ,
 
 470 U.S. 564
 
 ,
 
 105 S.Ct. 1504
 
 ,
 
 84 L.Ed.2d 518
 
 (1985), inhabit that ironic junction where the role of facts becomes the essence of the rule of law. But
 
 Gall
 
 's promise was never fulfilled. By adopting, expanding, and rigidly applying the categorical approach to the characterization of crimes of violence by a defendant, appellate courts have subjected too many discretionary trial-court sentencing determinations to
 
 de novo
 
 review. This appellate approach has not only led courts to "reach counterintuitive results, and ones which are not what Congress intended."
 
 United States v. Faust
 
 ,
 
 853 F.3d 39
 
 , 61 (1st Cir. 2017) (Lynch J., concurring). It has further undermined the authority of district courts as finders of fact, even where the facts are clearly ascertainable and readily discerned.
 

 My fine colleague, Judge Motz, has written thoughtfully. And my friends in the majority are certainly not alone in derogating the fact-finding function, but part of an overreach all too prevalent in appellate ranks throughout the country. The majority cloaks its latest arrogation of authority in dulcet reassurances: "[N]othing in our holding restricts the broad discretion of district judges to make case-by-case sentencing determinations ... Although judges must consult the advisory Sentencing Guidelines, they may vary from these recommendations in light of the factors listed in
 
 18 U.S.C. § 3553
 
 (a)." Maj. Op. at 252. It is true that district judges retain the ability to vary from the Sentencing Guidelines' recommendations. But variant sentences can shed their presumption of reasonableness and are more easily slapped down.
 
 United States v. Johnson
 
 ,
 
 242 Fed. Appx. 7
 
 , 10 (4th Cir. 2007). What is more, the time and effort we are spending on making categorical determinations unmistakably sends this message: categorical holdings may, in the context of the Guidelines, be "advisory," Maj. Op. at 252-53, but they carry the peremptory bearing of commands. Finally, despite the majority's reassurances, it is openly skeptical of the ability of triers of fact to make the kind of determinations a case-specific approach here would require. Maj. Op. at 247-78. Plainly the majority has far more faith in the ability of appellate judges to make legal determinations than it has in triers-of-fact to make factual ones.
 

 Now triers of fact have suffered a double whammy. Just as application of the categorical approach to crime-of-violence sentencing determinations displaces the district judge, application of the categorical approach to the residual clause of
 
 18 U.S.C. § 924
 
 (c)(3) displaces both the trial judge and jury. The majority converts the question before us-whether Simms committed a crime of violence-from an ordinary one of fact into a lofty one of constitutional law that has nothing at all to do with Simms as an individual. It makes the standard of review
 
 de novo
 
 . It discards the limited sufficiency review normally reserved for jury verdicts.
 
 See
 

 Musacchio v. United States
 
 , --- U.S. ----,
 
 136 S.Ct. 709
 
 , 715,
 
 193 L.Ed.2d 639
 
 (2016). It jettisons the clear error review normally accorded district courts' sentencing findings. In so doing it runs the role of juries and trial judges further into the ground.
 

 To this, the majority offers only an adjectival denial that begs the question.
 

 Ante
 
 at n. 12. Its whole exercise is systemically damaging. In certain circumstances, the categorical approach is useful because it relieves district courts of the institutional burden involved in reaching back through time to discover the undiscoverable.
 
 Moncrieffe v. Holder
 
 ,
 
 569 U.S. 184
 
 , 200-01,
 
 133 S.Ct. 1678
 
 ,
 
 185 L.Ed.2d 727
 
 (2013). Those circumstances are not present here. Joseph Simms pleaded guilty, not because of some legal misunderstanding but because he robbed a McDonald's at gunpoint. Simms and his conspirator snuck into the occupied restaurant in the middle of the night through the drive-through window. Once inside, Simms used his gun to menace the employees and demand money. He even tried to strike one of them before ordering the workers to gather in the back office. He thereupon forced the manager at gunpoint to open the safe and hand over the money. With the money in hand, Simms struck the manager on the top of his head with the gun, threw the cash drawer at another employee, and fled.
 

 Those are the facts. That is the actuality of it all. The trial court had this entire narrative at its disposal because, like all cases brought under § 924(c), this conduct was part of instant offense. Simms' actions are amply detailed in the pre-sentencing report which was not contested. Thus, there is not even an arguable institutional deficit at work here; the trier of fact's unique competence should be more than sufficient to decide whether Simms committed a crime of violence.
 

 Unlike the categorical approach, the case-specific approach would allow the trial judge and jury to look at what is before them and do what they do best. Under this approach-approved by the First Circuit in
 
 United States v. Douglas
 
 ,
 
 907 F.3d 1
 
 (1st Cir. 2018), the Eleventh Circuit in
 
 Ovalles v. United States
 
 ,
 
 905 F.3d 1231
 
 (11th Cir. 2018) (en banc), and the Second Circuit in
 
 United States v. Barrett
 
 ,
 
 903 F.3d 166
 
 (2d Cir. 2018) -the trier of fact would determine whether robberies like Simms' "involved a substantial risk that physical force against the person or property of another may be used," resolving the question no differently than it would the application of any other element to the facts of the offense.
 
 18 U.S.C. § 924
 
 (c)(3)(B). Our review would be appropriately deferential and strictly limited, stepping in only if no reasonable trier of fact could have found a crime of violence.
 
 See
 

 Jackson v. Virginia
 
 ,
 
 443 U.S. 307
 
 , 318-19,
 
 99 S.Ct. 2781
 
 ,
 
 61 L.Ed.2d 560
 
 (1979). Thus would the case-specific approach begin to right the indefensible imbalance occasioned by appellate micro-management.
 

 Ah, but in abjuring the case-specific approach, the majority is able to say, as a matter of law naturally, that the statute is too vague and that Simms, in conspiring to rob a fast food restaurant at gunpoint, committed no crime of violence. And as it stands, I am left scratching my head and attempting to find some even remotely plausible explanation for the appellate assumption of what should be a routine fact-finding role. I suppose it could be an example of the old Barnum-and-Bailey urge to move our act to center ring. Or perhaps we simply do all this because we can-an exhibition of appellate muscularity profoundly at odds with the restraint belonging to the rule of law.
 

 This appellate regency is not consonant with common sense, and is at cross-purposes with the thrust of humane sentencing reforms. Those reforms have concentrated in major part on reducing mandatory sentences for drug offenses.
 
 See, e.g.,
 
 First Step Act of 2018, S. 756, 115th Cong. § 401 (2018) (reducing mandatory minimums for prior drug offenders but expanding them to prior violent felons under the Controlled Substances
 Act). Here, by contrast, the majority is mounting a transparent attack upon Congress' intent to punish crimes of violence-particularly recidivist crimes of violence-more severely, an intent grounded in the basic proposition that violent offenders,
 
 18 U.S.C. § 924
 
 (c), and repeat offenders,
 
 18 U.S.C. § 924
 
 (e), pose a greater threat to public wellbeing.
 

 To repeat, the majority's approach is even at odds with the asserted rationale of the categorical approach itself, which is to spare district courts the burden of relitigating difficult-to-ascertain facts to determine whether or not past offenses are crimes of violence.
 
 Moncrieffe
 
 , 569 U.S. at 200-01,
 
 133 S.Ct. 1678
 
 . But this is a present-offense case. The trier of fact here has all the tools it needs to do the job. Rather than use these tools, the majority would have us take yet another gratuitous flight from reality by throwing out the entire residual clause of § 924(c)(3) and potentially releasing a large and untold number of the most violent cohort of criminal offenders prematurely back on to the streets. This approach floats impossibly above the reality that the trier of fact could capably bring to the task. The hallmarks of the appellate ascendancy are once again painfully apparent, including an obliviousness to the fates of future victims, unknown and anonymous to judges, but whom Congress, in its wisdom, sought to shelter.
 

 The credo now seems to be to inflict more, not less, damage upon the whole edifice of law. The majority is so wedded to the categorical approach that it would rather strike down the residual clause of § 924(c)(3) in its entirety than recognize trial courts' inherent capabilities. Constitutional assault now takes precedence over constitutional avoidance.
 
 *
 

 Only by adopting the categorical approach does the majority create constitutional problems for itself. The vagueness question that plagued the Supreme Court in
 
 Sessions v. Dimaya
 
 , --- U.S. ----,
 
 138 S.Ct. 1204
 
 ,
 
 200 L.Ed.2d 549
 
 (2018), disappears altogether upon the adoption of the case-specific approach. The text of 18 U.S.C. 924(c)(3)(B) supports it: as Judge Niemeyer indicates, language like "involves conduct" and "in the course of" and "by its nature" can easily and fairly be read to mandate a case-specific approach. The elements clause of
 
 18 U.S.C. § 924
 
 (c)(3)(A) and the residual clause of
 
 18 U.S.C. § 924
 
 (c)(3)(B) were written very differently for a reason. Determinations of "substantial risk" are familiar territory to district judges and juries,
 
 Johnson v. United States
 
 , --- U.S. ----,
 
 135 S.Ct. 2551
 
 , 2561,
 
 192 L.Ed.2d 569
 
 (2015), and we have interpreted similar language to require a case-specific approach before,
 
 United States v. Price
 
 ,
 
 777 F.3d 700
 
 (4th Cir. 2015). What, if anything, the text leaves ambiguous, Congress' purpose makes manifest: this statute was plainly intended to punish people like Joseph Simms who use firearms to inspire fear and visit lawless and unforgettable trauma upon their fellow citizens.
 

 This whole enterprise will not end well. Territorial grabs are seldom becoming to the rule of law, and the ouster of trial courts, juries, and indeed Congress from their rightful place in criminal justice is becoming one of the worst. This case does not even mount a frontal assault upon the categorical approach, only to the most extreme manifestations of it. Lacking any rational explanation for the present state of affairs, I can only conclude that the very words "categorical approach" exert some irresistible pull on the appellate psyche. Like the children of medieval Hamelin, robbed of their reason, courts are left only to follow the pied piper's song off the cliff. But that does not mean we cannot wish a fond and affectionate farewell to those tumbling into the seas.
 

 NIEMEYER, Circuit Judge, with whom Judges WILKINSON, DUNCAN, AGEE, KEENAN, and QUATTLEBAUM join, dissenting:
 

 In holding that the definition of "crime of violence" in
 
 18 U.S.C. § 924
 
 (c)(3)(B) is unconstitutionally vague and that § 924(c)(1) 's prohibition on using a firearm in connection with a crime of violence can therefore never be enforced contemporaneously with a Hobbs Act robbery conspiracy under
 
 18 U.S.C. § 1951
 
 , the majority insists that the "categorical approach" must be applied to assess whether the charged Hobbs Act conspiracy is a crime of violence. But this insistence both (1) distorts the basic reasons for and limited application of the categorical approach and (2) rejects a sensible reading of § 924(c) that would avoid holding a key part of a major criminal law unconstitutional. Consequently, thousands of § 924(c)(1) convictions will unnecessarily be challenged as premised on what the majority today concludes is an unconstitutionally vague provision, even though the parties in those cases had little difficulty understanding, enforcing, or defending the § 924(c)(1) charges at issue.
 

 In reaching its conclusion, the majority relies on the Supreme Court's decisions in
 
 Johnson v. United States
 
 , --- U.S. ----,
 
 135 S.Ct. 2551
 
 ,
 
 192 L.Ed.2d 569
 
 (2015), and
 
 Sessions v. Dimaya
 
 , --- U.S. ----,
 
 138 S.Ct. 1204
 
 ,
 
 200 L.Ed.2d 549
 
 (2018), where the Court found unconstitutionally vague the "residual clauses" defining "violent felony" and "crime of violence" in
 
 18 U.S.C. § 924
 
 (e) and § 16(b), which were used to categorically characterize
 
 prior convictions
 
 . While § 924(c) employs a similar residual clause to define "crime of violence" in describing proscribed conduct, the definition in § 924(c) does not require one to imagine in the abstract the "ordinary case" of a particular crime and then to assess its risk of violence, as required by § 924(e) and § 16(b) to determine whether
 
 prior convictions
 
 were for violent crimes.
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2557-58 ;
 
 Dimaya
 
 , 138 S.Ct. at 1215-16. Instead, as relevant here, § 924(c)(1) requires rather straightforwardly that the government prove that the defendant (1) used, carried, or possessed a firearm (2) in connection with (3) a crime of violence, which, in this case, was alleged to be a Hobbs Act conspiracy. In this distinct context, § 924(c) can readily be read as requiring the government to prove to the jury, as an element of the offense, that a particular Hobbs Act conspiracy charged in an indictment qualifies as a crime of violence by showing that
 
 that
 
 offense, "by its nature," posed "a substantial risk" of physical force being used.
 
 18 U.S.C. § 924
 
 (c)(3)(B). And in both
 
 Johnson
 
 and
 
 Dimaya
 
 , the Supreme Court could not have been clearer that there are
 
 no
 
 vagueness problems when a crime-of-violence definition like § 924(c)(3)(B) 's is applied to "real-world conduct" in precisely this manner-that is, to assess "the riskiness of conduct in which
 an individual defendant engage[d]
 
 on a particular occasion
 
 ."
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2561 ;
 
 see also
 

 Dimaya
 
 , 138 S.Ct. at 1215-16.
 

 In this case, Joseph Simms pleaded guilty to two counts-Count I charging him with conspiracy to commit Hobbs Act robbery, in violation of
 
 18 U.S.C. § 1951
 
 , and Count II charging him with brandishing a firearm during the commission of a "crime of violence"-namely, the Hobbs Act conspiracy-in violation of § 924(c)(1)(A). The crime-of-violence element in the § 924(c)(1) charge, even though defined in the same terms as the crime-of-violence definition in § 16(b), did not refer to a prior conviction in the abstract but to the real-world conduct alleged in charging the Hobbs Act violation. Specifically, Count I charged that Simms and others conspired to, and did in fact, rob McDonald's Restaurant # 31619 in Goldsboro, North Carolina, on April 14, 2014. To prove that Simms committed that crime, the government would have been required to show that Simms conspired unlawfully to obstruct, delay, or affect commerce by "robbery," defined to mean:
 

 the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will,
 
 by means of actual or threatened force, or violence, or fear of injury
 
 , immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.
 

 Id
 
 . § 1951(b)(1) (emphasis added). And then to prove further that Simms's particular Hobbs Act conspiracy offense-which, again, was alleged to have culminated in an actual robbery-qualified as a crime of violence for purposes of the § 924(c)(1)(A) charge, the government would have been required to show that his conspiracy, "by its nature, involve[d] a substantial risk" of physical force being used "against the person or property of another."
 
 Id
 
 . § 924(c)(3)(B).
 

 No one has asserted or can assert that this charge against Simms is unconstitutionally vague, as defined in
 
 Kolender v. Lawson
 
 ,
 
 461 U.S. 352
 
 , 357-58,
 
 103 S.Ct. 1855
 
 ,
 
 75 L.Ed.2d 903
 
 (1983) (stating that the Due Process Clause "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that ... establish[es] minimal guidelines to govern law enforcement"). Instead, the majority purports to make it vague by applying a "categorical approach" designed for completely distinct and limited circumstances, even though nothing in the statute so requires. Simms's conviction should be affirmed.
 

 I
 

 Simms and two others conspired to rob the McDonald's Restaurant on April 14, 2014. Shortly after 1:00 a.m., Simms and one co-conspirator entered the restaurant by crawling through the drive-through window while the third person served as a lookout. Simms then pointed a gun at the restaurant's manager and demanded money. At gunpoint, the manager opened the restaurant's safe, after which Simms struck the manager on the top of his head with the gun and threw a cash drawer at another employee. The robbers fled with $1,100.
 

 After Simms was arrested and indicted, he pleaded guilty to Counts I and II of the indictment. Count I charged him with conspiracy to commit Hobbs Act robbery, in violation of
 
 18 U.S.C. § 1951
 
 , and it specifically alleged, as an overt act taken in furtherance of the conspiracy, that Simms and others committed the agreed-upon
 robbery. And Count II charged that Simms had brandished a firearm during and in relation to a crime of violence-namely, the Hobbs Act violation alleged in Count I-in violation of
 
 18 U.S.C. § 924
 
 (c)(1)(A). In exchange for his guilty plea on these two counts, the government agreed to dismiss a third count charging that Simms had possessed a firearm after having been convicted of a felony, in violation of
 
 18 U.S.C. §§ 922
 
 (g)(1) and 924(a)(2).
 

 During sentencing, Simms objected to his § 924(c)(1)(A) conviction under Count II in light of the Supreme Court's decision in
 
 Johnson
 
 , contending that the required element that he use a firearm during and in relation to a "crime of violence" was not satisfied because the residual clause used to define "crime of violence" in § 924(c)(3)(B) was unconstitutionally vague. The district court overruled Simms's objection and sentenced him to 199 months' imprisonment-115 months for the Hobbs Act conspiracy and a mandatory consecutive 84 months for the § 924(c)(1)(A) offense.
 

 Simms filed this appeal, maintaining that his § 924(c) conviction cannot stand because it is premised on a definition of "crime of violence" that is unconstitutionally vague under the reasoning of
 
 Johnson
 
 and
 
 Dimaya
 
 , the latter of which was decided after Simms filed his notice of appeal.
 

 II
 

 Simms contends that because there is "[n]o meaningful difference" between the definition of "violent felony" in § 924(e)(2)(B)(ii) that was found unconstitutionally vague in
 
 Johnson
 
 and the definition of "crime of violence" that was used to support his conviction under § 924(c)(1)(A), we must find the latter definition unconstitutionally vague and invalidate his conviction. And
 
 Dimaya
 
 , he maintains, confirms this conclusion since the text of " Section 924(c) 's residual clause [defining crime of violence] is identical to Section 16(b)." According to Simms, § 924(c)(3)(B) compels the use of "the same ordinary case approach and risk inquiry" that doomed the provisions in
 
 Johnson
 
 and
 
 Dimaya
 
 , and the same result must therefore also follow here. The majority adopts the same basic approach. Such an argument, however, is too formulaic, overlooking the role and context of the definitions, as well as the limited role of the categorical approach.
 

 In both
 
 Johnson
 
 and
 
 Dimaya
 
 , the Court addressed the question of applying the "categorical approach" to assess whether
 
 prior convictions
 
 were for violent crimes when such crimes were defined to include any felony that, in
 
 Johnson
 
 , "involves conduct that presents a serious potential risk of physical injury,"
 
 18 U.S.C. § 924
 
 (e)(2)(B)(ii) or, in
 
 Dimaya
 
 , that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense,"
 
 id
 
 . § 16(b). The difficulty the Supreme Court found in making that determination arose not from the inability to assess violent conduct as defined by those "residual clauses," but from assessing whether the prior conviction,
 
 considered under the categorical approach
 
 , was for a violent crime under those definitions. In short, it was the limitation imposed by applying the categorical approach-where facts and conduct may not be considered-to those residual clauses that created the problem of vagueness for the Court.
 

 The "categorical approach" is a specific form of analysis adopted in light of the need to determine whether
 
 prior convictions
 
 were for "violent felonies" or "crimes of violence" under federal provisions-chief
 among them
 
 18 U.S.C. § 924
 
 (e) -that impose sentencing or other consequences on individuals who have those types of convictions
 
 in their criminal histories
 
 . In
 
 Taylor v. United States
 
 ,
 
 495 U.S. 575
 
 , 600-02,
 
 110 S.Ct. 2143
 
 ,
 
 109 L.Ed.2d 607
 
 (1990), the Supreme Court recognized that, when applying § 924(e) 's sentencing enhancement, the question of whether a defendant's prior conviction was for a "violent felony" must focus exclusively on (1) the elements of the statute under which the defendant was convicted and (2) the fact of conviction, and exclude any evaluation of the particular facts or conduct underlying the prior conviction. In reaching this conclusion, the Court started with the statutory text but hardly found it conclusive.
 
 See
 

 id
 
 . at 600-01,
 
 110 S.Ct. 2143
 
 (1990) ("First, the language of § 924(e)
 
 generally supports the inference
 
 that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions.... Read in ... context, [the text]
 
 most likely
 
 refers to the elements of the statute of conviction, not to the facts of each defendant's conduct" (emphasis added) ). Rather, what appeared to seal the deal in favor of the "categorical approach" was the Court's serious concern that,
 
 in the context of prior convictions
 
 , "the practical difficulties and potential unfairness of a factual approach [would be] daunting."
 

 Id.
 

 at 601
 
 ,
 
 110 S.Ct. 2143
 
 . In this regard, the Court stressed both the impracticality of attempting to relitigate potentially long-ago events, as well as the Sixth Amendment problem that would be created if sentencing judges were to make factual findings about the nature of the conduct underlying a defendant's prior conviction.
 

 Id.
 

 at 601-02
 
 ,
 
 110 S.Ct. 2143
 
 ;
 
 see also
 

 Descamps v. United States
 
 ,
 
 570 U.S. 254
 
 , 269-70,
 
 133 S.Ct. 2276
 
 ,
 
 186 L.Ed.2d 438
 
 (2013) (emphasizing "the categorical approach's Sixth Amendment underpinnings," as well as the " 'daunting' difficulties and inequities that first encouraged [the
 
 Taylor
 
 Court] to adopt the categorical approach").
 

 While the precise question resolved by
 
 Taylor
 
 was whether a defendant who had in fact committed "burglary," as federal law defines that term, but was convicted under a broader state statute should be treated as having a "burglary" conviction when applying § 924(e), the Supreme Court subsequently confirmed that the "categorical approach" also applied to the "residual clause" portion of the "violent felony" definition,
 
 see
 

 James v. United States
 
 ,
 
 550 U.S. 192
 
 , 201-02,
 
 127 S.Ct. 1586
 
 ,
 
 167 L.Ed.2d 532
 
 (2007). It did so even though it acknowledged that the residual clause's text-covering "crime[s]" that "involve[ ] conduct that presents a serious potential risk of physical injury to another," § 924(e)(2)(B)(ii) -was "
 
 more
 

 ambiguous
 
 " and "
 
 pose[d] greater interpretive difficulty
 
 " as to whether "it too refers to crimes as generically defined."
 
 Nijhawan v. Holder
 
 ,
 
 557 U.S. 29
 
 , 36,
 
 129 S.Ct. 2294
 
 ,
 
 174 L.Ed.2d 22
 
 (2009) (emphasis added).
 

 Unique problems arose, however, as courts attempted to apply the "categorical approach" to determine whether the offense of conviction-as defined by its elements, rather than its underlying conduct-was one that "
 
 involves conduct
 
 that presents a serious potential risk of physical injury."
 
 18 U.S.C. § 924
 
 (e)(2)(B)(ii) (emphasis added). Initially, in attempting to provide clarity, the Court instructed that "the proper inquiry is whether the conduct encompassed by the elements of the offense,
 
 in the ordinary case
 
 , presents a serious potential risk of injury to another."
 
 James
 
 ,
 
 550 U.S. at 208
 
 ,
 
 127 S.Ct. 1586
 
 (emphasis added);
 
 see also
 

 Leocal v. Ashcroft
 
 ,
 
 543 U.S. 1
 
 , 7, 10,
 
 125 S.Ct. 377
 
 ,
 
 160 L.Ed.2d 271
 
 (2004) (similarly holding that, "[i]n determining whether [an individual's prior] conviction falls within the ambit of § 16 ['s definition of crime of violence], the statute directs our focus to the 'offense' of conviction," "rather than to the particular facts relating to [the individual's] crime," and interpreting § 16(b) in particular as "cover[ing] offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense"). But in both
 
 Johnson
 
 and
 
 Dimaya
 
 , the Court ultimately concluded that this ordinary-case form of the "categorical approach" entailed too much speculation to be consistent with the Due Process Clause's prohibition on enforcing vague laws.
 

 In particular, the Court in
 
 Johnson
 
 addressed the residual clause portion of the definition of "violent felony" in § 924(e) -a statute that provides a 15-year mandatory minimum sentence for certain firearm offenses if the defendant has three prior convictions for a "violent felony." Addressing how § 924(e) 's residual clause failed in the context of the categorical approach, the Court explained:
 

 Two features of the residual clause conspire to make it unconstitutionally vague. In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime.
 
 It ties the judicial assessment of risk to a judicially imagined "ordinary case" of a crime [as required by the categorical approach], not to real-world facts or statutory elements.
 

 * * *
 

 At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony.
 
 It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction [as required by the categorical approach]
 
 .
 

 Johnson
 
 ,
 
 135 S.Ct. at 2557-58
 
 (emphases added). The Court noted further that its own "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm[ed] its hopeless indeterminacy."
 
 Id
 
 . at 2558-59 (referring to the Court's prior decisions in
 
 James
 
 ,
 
 550 U.S. 192
 
 ,
 
 127 S.Ct. 1586
 
 ,
 
 167 L.Ed.2d 532
 
 ;
 
 Begay v. United States
 
 ,
 
 553 U.S. 137
 
 ,
 
 128 S.Ct. 1581
 
 ,
 
 170 L.Ed.2d 490
 
 (2008) ;
 
 Chambers v. United States
 
 ,
 
 555 U.S. 122
 
 ,
 
 129 S.Ct. 687
 
 ,
 
 172 L.Ed.2d 484
 
 (2009) ; and
 
 Sykes v. United States
 
 ,
 
 564 U.S. 1
 
 ,
 
 131 S.Ct. 2267
 
 ,
 
 180 L.Ed.2d 60
 
 (2011) ). The Court concluded that "[i]nvoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process."
 
 Id
 
 . at 2560. In so concluding, however, the Court was quick to note that numerous statutes using terms like "substantial risk"-which the government had warned would be affected by the Court's holding-were not, in fact, in constitutional jeopardy. The Court explained:
 

 [A]lmost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages
 
 on a particular occasion
 
 .
 
 As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly ... some matter of degree
 
 ."
 

 Id
 
 . at 2561 (first emphasis in original; second emphasis added) (quoting
 
 Nash v. United States
 
 ,
 
 229 U.S. 373
 
 , 377,
 
 33 S.Ct. 780
 
 ,
 
 57 L.Ed. 1232
 
 (1913) ).
 

 In
 
 Dimaya
 
 , the Court followed precisely the
 
 Johnson
 
 analysis, finding the residual clause used to define "crime of violence" in
 § 16(b) unconstitutionally vague. At issue in
 
 Dimaya
 
 were provisions of the Immigration and Nationality Act that rendered deportable any alien convicted of an "aggravated felony,"
 
 8 U.S.C. § 1227
 
 (a)(2)(A)(iii), which was defined to include "crime[s] of violence," as defined in § 16,
 
 see
 

 id
 
 . § 1101(a)(43)(F). Section 16, in turn, defined "crime of violence" in part by a residual clause similar to the one used in § 924(e), which was addressed in
 
 Johnson
 
 . Specifically, the § 16 residual clause defined crime of violence to include any felony offense "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."
 
 18 U.S.C. § 16
 
 (b).
 

 After recalling in extensive detail the holding and reasoning of
 
 Johnson
 
 , the
 
 Dimaya
 
 Court applied
 
 Johnson
 
 to find the residual clause in § 16(b) also unconstitutionally vague. It explained:
 

 To begin where
 
 Johnson
 
 did, § 16(b) also calls for a court to identify a crime's "ordinary case" in order to measure the crime's risk.... Nothing in § 16(b) helps courts to perform that task, just as nothing in [ § 924(e) ] did.... [T]he "ordinary case" remains, as
 
 Johnson
 
 described it, an excessively "speculative," essentially inscrutable thing.
 

 And § 16(b) also possesses the second fatal feature of [ § 924(e) 's] residual clause: uncertainty about the level of risk that makes a crime "violent." In [ § 924(e) ], that threshold was "serious potential risk"; in § 16(b), it is "substantial risk." ... The difficulty comes, in § 16 's residual clause just as in [ § 924(e) 's], from applying such a standard to "a judge-imagined abstraction"-
 
 i.e.
 
 , "an idealized ordinary case of the crime." It is then that the standard ceases to work in a way consistent with due process.
 

 138 S.Ct. at 1215-16 (citations omitted). But again, as in
 
 Johnson
 
 , the Court repeated that it did " 'not doubt' the constitutionality of applying § 16(b) 's 'substantial risk [standard] to real-world conduct.' "
 
 Id
 
 . at 1215 (quoting
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2561 ).
 

 Thus, in both
 
 Johnson
 
 and
 
 Dimaya
 
 , the constitutional vagueness problem arose from having to imagine the ordinary case of an offense in the abstract-as required by the categorical approach-and then to assess that imagined crime's risk of violence.
 

 But the two features identified in
 
 Johnson
 
 and
 
 Dimaya
 
 that rendered the residual clauses there unconstitutional-the requirements of (1) imagining the ordinary case of a crime and (2) applying to it a qualitative risk standard-do not arise when enforcing § 924(c) because that statute does not require judicial assessment of an imagined ordinary case. Instead, § 924(c) uses "crime of violence" as an element that is charged in the indictment
 
 in the context of real-world conduct on a particular occasion
 
 .
 
 See
 

 United States v. Rodriguez-Moreno
 
 ,
 
 526 U.S. 275
 
 , 280,
 
 119 S.Ct. 1239
 
 ,
 
 143 L.Ed.2d 388
 
 (1999) (noting that the commission of a crime of violence is "an essential conduct element of the § 924(c)(1) offense"). In essence, rather than creating sentencing or immigration consequences for
 
 past convictions
 
 , § 924(c)(1)"punishes the temporal and relational conjunction of two separate acts, on the ground that together they pose an extreme risk of harm."
 
 Rosemond v. United States
 
 ,
 
 572 U.S. 65
 
 , 75,
 
 134 S.Ct. 1240
 
 ,
 
 188 L.Ed.2d 248
 
 (2014).
 

 Because real-world conduct was charged in Simms's indictment, including the Hobbs Act violation alleged to be a crime of violence, we are not left to speculate about an "ordinary case"-a "judge-imagined abstraction."
 

 Johnson
 
 ,
 
 135 S.Ct. at 2557-58
 
 . Instead, the indictment informs us of the conduct alleged to constitute a crime of violence, precluding the need for guesswork. In Count II, Simms was charged with brandishing a firearm on April 14, 2014, while conspiring to and actually robbing a specified McDonald's restaurant and its employees in Goldsboro, with the robbery element being defined as "taking ... personal property from [a] person ... by means of actual or threatened force, or violence, or fear of injury ... to his person or property."
 
 18 U.S.C. § 1951
 
 (b)(1). Simms was thus clearly notified of the government's allegation that
 
 his
 
 Hobbs Act conspiracy was among the offenses that, "by [their] nature, involve[ ] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."
 
 Id
 
 . § 924(c)(3)(B).
 

 This indictment does not invite reliance on some vague, imagined, ordinary offense. Rather, it alleges specific offense conduct, which had to be proved with real-world facts in order to obtain a conviction. Simms was thus placed on full notice of the charges and of what had to be proved against him. The problem identified in
 
 Johnson
 
 and
 
 Dimaya
 
 with courts' imagining "an 'idealized ordinary case of the crime,' " such that "no one could tell how much risk the offense generally posed,"
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1214
 
 (quoting
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2557 ), is simply not a problem in enforcing § 924(c). The prosecution of the offense does not involve divining the degree of risk from "a judge-imagined abstraction-
 
 i.e.
 
 , an idealized ordinary case of the crime."
 
 Id
 
 . at 1216 (internal quotation marks and citation omitted).
 

 In short, in both
 
 Johnson
 
 and
 
 Dimaya
 
 , the Supreme Court was presented with the problem of
 
 applying the ordinary-case categorical approach to a prior conviction
 
 and thus imagining an abstract offense with a risk that is unknowable due to that very act of judicial imagination. Under § 924(c), however, no prior conviction must be imagined. To the contrary, the commission of a crime of violence must be alleged as an
 
 element
 
 of the § 924(c) offense and must be proved with real-world facts that occurred on a particular occasion. Thus, the definition of crime of violence, as used in § 924(c) as an element of the offense, does not implicate the unique context identified in both
 
 Johnson
 
 and
 
 Dimaya
 
 , where the analysis was limited by the severe restrictions imposed by the categorical approach as applied to assess
 
 prior convictions
 
 .
 

 The majority argues that Congress adopted the "categorical approach" by including the language in § 924(c)(3)(B) that a crime of violence includes a felony "offense ... that
 
 by its nature
 
 , involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." It asserts that the phrase "offense ... that by its nature," naturally construed, means "categorically" and thus incorporates the "categorical approach."
 
 Ante
 
 at 239-40, 240-41. Indeed, the majority concludes that the
 
 only
 
 "plausible construction" of § 924(c)(3)(B) is that it "requires application of the ordinary-case categorical approach."
 
 Ante
 
 at 240, 251.
 

 But the majority's insistence on interpreting § 924(c)(3)(B) as requiring the "categorical approach" represents the judicial equivalent of cramming a square peg into a round hole. Again, the lynchpin of the majority's textual argument is § 924(c)(3)(B) 's provision that an offense qualifies as a "violent felony" if "
 
 by its nature
 
 " it involves the requisite risk of physical force, and it notes that "nature" is defined as "the basic or inherent features, character, or quality of something."
 

 Ante
 
 at 241 (quoting Oxford Dictionary of English 1183 (3d ed. 2010)). But while the majority emphasizes that § 924(c)(3)(B) uses the phrase "by its nature" to modify "offense," it overlooks that "offense" is a word that, as the Supreme Court has recognized, is sometimes used in ordinary speech to "refer to a generic crime, say, the crime of fraud or theft in general" and other times readily used to "refer to the specific acts in which an offender engaged on a specific occasion"-
 
 e.g.
 
 , "the fraud that the defendant planned and executed last month."
 
 Nijhawan
 
 ,
 
 557 U.S. at 33-34
 
 ,
 
 129 S.Ct. 2294
 
 . And it is just as linguistically reasonable to speak of the "nature" of the defendant's particular offense, as it is to refer to the "nature" of the general offense as defined by law.
 
 See
 

 United States v. Barrett
 
 ,
 
 903 F.3d 166
 
 , 182 (2d Cir. 2018) (noting that "nothing in the[ ] definitions [of the word 'nature'] indicates whether the offense whose inherent characteristics are to be considered is the generic crime or the particular one charged");
 
 accord
 

 United States v. Douglas
 
 ,
 
 907 F.3d 1
 
 , 11 (1st Cir. 2018) ;
 
 Ovalles v. United States
 
 ,
 
 905 F.3d 1231
 
 , 1248 (11th Cir. 2018) (en banc).
 

 In addition, the majority's argument is undermined by another feature of § 924(c)(3) 's text-namely, the textual difference between subsections (A) and (B). Subsection (A) provides that a "crime of violence" includes any felony offense that has "
 
 as an element
 
 the use, attempted use, or threatened use of physical force," whereas subsection (B) provides that a "crime of violence" includes any felony offense that "
 
 by its nature
 
 [ ] involves a substantial risk" of physical force being used in the course of its
 
 commission
 
 . The phrase "by its nature" in subsection (B) is thus distinct from the use of "elements" in subsection (A), suggesting that the analysis under subsection (B) should focus not on how an offense is defined by law, but on the nature of the defendant's offense and the degree of risk posed by it. And this interpretation is only strengthened by subsection (B)'s focus on the risk that force may be "used in the course of committing the offense." Moreover, such a distinction between subsections (A) and (B) makes good sense. Subsection (A) thus qualifies a felony as a "crime of violence" if its elements require proof that the defendant "use[d], attempt[ed] [to] use, or threaten[ed] [to] use ... physical force," while subsection (B) allows that even if an offense does not have such an
 
 element
 
 , it can still qualify as a crime of violence if, as committed on a particular occasion, it
 
 actually
 
 "
 
 involve[d]
 
 a substantial risk" of physical force being used. And Congress added further certain phrases to emphasize that this determination is intended to be relatively broad, covering even those particular violations that, "
 
 by [their] nature
 
 , involve a substantial risk that physical force ...
 
 may
 
 be used."
 

 This last statutory feature in particular also precludes the majority's additional argument that the rule against surplusage
 
 compels
 
 a categorical interpretation of § 924(c)(3)(B).
 
 See
 

 ante
 
 at 240-41.
 

 To be sure, this reading of § 924(c)(3)(B) differs from the interpretation the Supreme Court in
 
 Johnson
 
 gave to the similar language defining "violent felony" in § 924(e), as well as from the
 
 Dimaya
 
 plurality's interpretation of the materially identical text in § 16(b). But this difference is readily explained by the fact that § 924(e) and § 16(b) are applied to characterize
 
 prior convictions
 
 , and the Court was therefore compelled to apply the categorical approach.
 
 See
 

 Johnson
 
 ,
 
 135 S.Ct. at 2562
 
 (concluding that " '[t]he only plausible interpretation' " of § 924(e) 's residual clause is that it "requires use of the categorical approach" (1) because the text's "emphasis on
 
 convictions
 
 indicates
 that 'Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories' " and (2) because of "the utter impracticality of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that
 
 conviction
 
 " (emphasis added) (quoting
 
 Taylor
 
 ,
 
 495 U.S. at 600-02
 
 ,
 
 110 S.Ct. 2143
 
 ) );
 
 see also
 

 Dimaya
 
 , 138 S.Ct. at 1217-18 (plurality opinion) (emphasizing, among other reasons for concluding that § 16(b) must be read as incorporating the categorical approach, (1) that the "Court adopted the categorical approach in part to avoid the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries" and (2) that a fact-based reading would create "the daunting difficulties of accurately reconstructing, often many years later, the conduct underlying a
 
 conviction
 
 ' " (emphasis added) (internal quotation marks, brackets, and citations omitted) ).
 

 By contrast, the definition of crime of violence in § 924(c)(3) applies
 
 only
 
 to contemporaneously charged conduct that is made an element of the § 924(c)(1) violation and
 
 never
 
 to prior convictions. And, in that distinct context, the important practical considerations and Sixth Amendment concerns that led the Court to develop and adhere to the categorical approach for similar residual clauses simply do not apply. It is therefore not surprising that § 924(c) has presented little difficulty to courts, prosecutors, and defense counsel in its enforcement, and the so-called problems with that statute have been created only by the effort to force the ordinary-case categorical approach, applicable in other circumstances, onto a statute that punishes the use of a firearm in connection with a crime of violence, in this case a Hobbs Act conspiracy.
 

 But were there any doubt about the proper construction of § 924(c) we would nonetheless have to give the statute the benefit of the doubt when a constitutional reading of it is "fairly possible," as I surely conclude.
 
 I.N.S. v. St. Cyr
 
 ,
 
 533 U.S. 289
 
 , 299-300,
 
 121 S.Ct. 2271
 
 ,
 
 150 L.Ed.2d 347
 
 (2001). This constitutional avoidance doctrine serves the "basic democratic function of maintaining a set of statutes that reflect, rather than distort, the policy choices that the elected representatives have made."
 
 Almendarez-Torres v. United States
 
 ,
 
 523 U.S. 224
 
 , 238,
 
 118 S.Ct. 1219
 
 ,
 
 140 L.Ed.2d 350
 
 (1998).
 

 I thus readily conclude that the residual clause in § 924(c) defining the "crime of violence" element of the offense is not unconstitutionally vague. Simms received ample notice of how to conform his conduct to the law, and the statute provides adequate standards to prevent "arbitrary and discriminatory enforcement."
 
 Kolender
 
 ,
 
 461 U.S. at 357
 
 ,
 
 103 S.Ct. 1855
 
 . I would accordingly affirm the district court's judgment.
 

 RICHARDSON, Circuit Judge, with whom Judge QUATTLEBAUM joins, dissenting:
 

 While robbing a McDonalds, Simms struck the manager on the head with a gun. By statute, if the nature of Simms's offense involved a "substantial risk of physical force," then it was a "crime of violence."
 
 18 U.S.C. § 924
 
 (c)(3)(B). And if we look to the facts here, it seems obvious that Simms's offense was a crime of violence: of course hitting someone over the head with a gun involves a substantial risk of physical force. And Simms agreed when he pleaded guilty.
 

 My colleagues in the majority take a different tack. Refusing to read the statute to apply to the facts of
 
 this
 
 case, they insist that the statute must be applied to
 some hypothetical conduct that would be involved in an "ordinary case" of federal robbery. Yet, by the majority's own account, the hypothetical, "ordinary case" interpretation is not workable here. In fact, even before adopting it, the majority accepts that its interpretation is unconstitutionally vague under the Fifth Amendment.
 

 This is not the right approach. It is our duty as judges, if we can, to give statutes a reasonable interpretation that conforms to the Constitution. Because the statute permits looking directly to Simms's conduct in pistol whipping a manager during a robbery, I respectfully dissent.
 

 I. Avoiding an Unconstitutional Construction
 

 Any statutory provision must be interpreted, whenever possible, to avoid unconstitutionality. Our duty to adopt saving constructions dates back more than two hundred years.
 
 See
 

 Mossman v. Higginson
 
 , 4 U.S. (4 Dall.) 12,
 
 1 L.Ed. 720
 
 (1800) ;
 
 Society for the Propagation of the Gospel v. Wheeler
 
 ,
 
 22 F. Cas. 756
 
 , 769 (C.C.D.N.H. 1814).
 
 [1]
 
 At base, the rule reflects respect for the political branches, presuming they intend to comply with our Constitution.
 
 [2]
 
 So long as it does not require doing violence to unambiguous language, courts must act to save a statute with any plausible constitutional interpretation.
 
 Grenada Cty. Supervisors v. Brogden
 
 ,
 
 112 U.S. 261
 
 , 269,
 
 5 S.Ct. 125
 
 ,
 
 28 L.Ed. 704
 
 (1884).
 

 Here, we face a binary choice. On the one hand, if Section 924(c)(3)(B) compels the "ordinary case" interpretation, then it is unconstitutionally vague and Simms escapes liability. On the other, if the statute permits a case-specific interpretation, then it is constitutional and Simms's guilty plea stands.
 

 While our choice is binary, statutory interpretation often is not. Typically, judges seek the "
 
 best reading
 
 of the statute by interpreting the words of the statute, taking account of the context of the whole statute, and applying the agreed-upon semantic canons." Brett Kavanaugh,
 
 Fixing Statutory Interpretation
 
 , 129 HARV . L. REV . 2118, 2121 (2016) (book review). Along the way to the "best" interpretation, we discard other possibilities. Not all the rejects are flat-out wrong (although some are). An interpretation may
 have some support in the text, and even from a canon, but still get left on the cutting-room floor in favor of another, better option. And we keep on discarding until we find the best one.
 

 But in some circumstances, we must abandon the search for the best reading of the statute. When a statute's best interpretation would render it unconstitutional, a court must identify and adopt any fairly possible interpretation that would save it.
 
 See
 

 Hooper v. California
 
 ,
 
 155 U.S. 648
 
 , 657,
 
 15 S.Ct. 207
 
 ,
 
 39 L.Ed. 297
 
 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."). That means looking for a plausible
 
 constitutional
 
 option for Section 924(c)(3)(B).
 
 [3]
 

 II. The Residual Clause of Section 924(c)(3)
 

 Having framed our endeavor, I begin by asking what readings of the statute are even conceivable. Once the conceivable interpretations are identified, I turn to evaluating which of those are plausible.
 

 Section 924(c)(3) defines the term "crime of violence" to mean
 

 an
 
 offense
 
 that is a felony and-
 

 (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
 

 (B) that
 
 by its nature
 
 ,
 
 involves a substantial risk that physical force
 
 against the person or property of another
 
 may be used in the course of committing the offense
 
 .
 

 (emphasis added). This statute provides two definitions of what constitutes a "crime of violence." The first, sometimes called the "elements clause," focuses on whether the "elements" of an offense include the "use, attempted use, or threatened use of physical force." The second, called the "residual clause," focuses on whether the offense's "nature" involves "a substantial risk that physical force" may be "used in the course of committing the offense." As its name conveys, the second clause is residual, meaning it operates as a catch-all for those offenders engaged in this type of risky conduct that might otherwise fail to meet the elements clause.
 

 A. Three Conceivable Interpretations of the Residual Clause
 

 The language and context of the residual clause point to three conceivable readings, each asking us to look at the offense through a different lens. First, an elements-based one: Does the offense legally require proof of a substantial risk of physical force? Second, a hypothetical one: Does a judicially imagined "ordinary" version of the offense involve conduct that presents a substantial risk of force? Third, a factual one: Does the specific offense involve actual conduct that presents a substantial risk of physical force?
 
 See generally
 

 Johnson v. United States
 
 , --- U.S. ----,
 
 135 S.Ct. 2551
 
 , 2557,
 
 192 L.Ed.2d 569
 
 (2015) (noting three possibilities for consideration: the statutory "elements," a "judicially imagined ordinary case," or "real-world facts"). These readings have been fleshed out in the context of other, similar statutes, although there is no binding Supreme Court
 precedent governing this particular statute.
 

 The first and most formalistic reading requires looking at the elements of the "offense."
 
 See
 

 Descamps v. United States
 
 ,
 
 570 U.S. 254
 
 , 257,
 
 133 S.Ct. 2276
 
 ,
 
 186 L.Ed.2d 438
 
 (2013). That is, one would ask whether one element of the crime is a substantial risk that physical force may be used.
 

 The second reading concentrates not on the legal elements of the crime but on the conduct thought to be ordinarily involved in violating those elements. This approach is similar to the first in that it is "categorical": once the courts decide whether a particular criminal statute satisfies the residual clause, that holding applies to any conviction under the statute, without a factfinder looking at what
 
 that
 
 defendant did. Yet it differs from the first in that it looks to conduct: namely "whether the
 
 conduct
 
 encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk."
 
 James v. United States
 
 ,
 
 550 U.S. 192
 
 , 208,
 
 127 S.Ct. 1586
 
 ,
 
 167 L.Ed.2d 532
 
 (2007) (emphasis added). This approach is an exercise in judicial imagination, requiring "a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk."
 
 Johnson
 
 ,
 
 135 S.Ct. at 2557
 
 .
 

 Real-world facts are the focus of the approach resulting from the third and final interpretation. This approach is like the second approach, and unlike the first, in that it looks at conduct. Yet unlike the second approach, it is not categorical and requires no judicial ingenuity: it asks only whether the actual conduct committed by the defendant presents a substantial risk on a case-by-case basis. The third approach has significant appeal, relieving judges of imagining hypotheticals and empowering factfinders (generally juries) to do their job.
 
 See
 
 Ante at 262-63 (Wilkinson, J., dissenting).
 

 B. The Case-Specific Interpretation of the Residual Clause is Plausible
 

 Thus, three conceivable interpretations are available. The first and third readings are constitutional; the second, "ordinary case" reading, would be unconstitutionally vague. We must therefore ask whether the first and third are fairly possible. If either is, then the "ordinary case" interpretation must be rejected to save the statute.
 

 Neither party argues that the first interpretation is plausible, and for good reason. To be sure, the term "offense" can be read to encompass the formalistic concept of a crime as defined by its elements. Indeed, "offense" takes that meaning in subsection A's elements clause. Yet there is little else good to say about this interpretation, and two considerations make it untenable. First, Congress knew how to specify an elements-based approach and did so in subsection A, but not in subsection B. Subsection B contemplates an understanding of "offense" that is broader than the formalistic subsection A.
 
 See
 

 United States v. Price
 
 ,
 
 777 F.3d 700
 
 , 708-09 (4th Cir. 2015). Second, I am aware of no other federal criminal statute with a "substantial risk" that "physical force" "may be used" as an actual element. And we generally avoid interpreting statutes to render them a nullity.
 

 The third interpretation is a different story. Consider again the term "offense." The term is ambiguous: it is consistent with the elements-based approach (as already noted), but also with the others. The Supreme Court has found it may refer to (1) "a generic crime, say, the crime of fraud or theft in general," or (2) "the specific acts in which an offender engaged on a specific occasion, say,
 
 the
 
 fraud that
 the defendant planned and executed last month."
 
 Nijhawan v. Holder
 
 ,
 
 557 U.S. 29
 
 , 33-34,
 
 129 S.Ct. 2294
 
 ,
 
 174 L.Ed.2d 22
 
 (2009) ;
 
 see also
 

 United States v. Hayes
 
 ,
 
 555 U.S. 415
 
 , 426,
 
 129 S.Ct. 1079
 
 ,
 
 172 L.Ed.2d 816
 
 (2009). While definition (1) fits the elements-based and "ordinary case" approaches, definition (2) permits consideration of the real-world conduct committed by the defendant.
 

 To decide which definition is appropriate, courts look to the statutory context. In some cases, context compels a case-specific approach based on real-world conduct.
 
 See
 

 Nijhawan
 
 ,
 
 557 U.S. at 40
 
 ,
 
 129 S.Ct. 2294
 
 . In others, context compels the "generic" interpretation.
 
 See
 

 id
 
 . at 37,
 
 129 S.Ct. 2294
 
 . The term may even be used in both senses within the same sentence: to mean a generic crime and how the specific crime was committed.
 
 See
 

 Hayes
 
 , 555 U.S. at 421,
 
 129 S.Ct. 1079
 
 (holding "offense" that "has, as an element, the use or attempted use of physical force ..., committed by a current or former spouse," requires a categorical determination of the elements but a fact-specific evaluation of the person who committed the offense).
 

 Our own precedent confirms that "offense" may compel examining real-world conduct. In
 
 Price
 
 , the statute defined "sex offense" to mean a "criminal offense that is a specified offense against a minor."
 
 777 F.3d at 704
 
 (quoting
 
 42 U.S.C. § 16911
 
 (5)(A)(ii) ). The statute then defined "specified offense[s] against a minor" according to a list of enumerated offenses and a residual clause encompassing "[a]ny conduct that by its nature is a sex offense against a minor."
 

 Id.
 

 (quoting
 
 42 U.S.C. § 16911
 
 (7)(I) ). In that context, we concluded, the statute "refers to how an offense was committed-not a generic offense."
 

 Id.
 

 at 709
 
 .
 
 [4]
 

 Here, we need only decide whether the fact-specific approach-which again, the Supreme Court has held is a permissible reading of the word "offense"-is
 
 plausible
 
 . And the context here shows that it is.
 

 Consider the phrase "by its nature." In ordinary use, "nature" means a "normal and characteristic quality" of something. Webster's Third New International Dictionary 1507-08 (1986);
 
 see also
 
 Oxford Dictionary of English 1183 (3d ed. 2010) ("basic or inherent features, character, or qualities of something"). This definition, however, merely raises the question of what the "something" is?
 
 See
 

 United States v. Barrett
 
 ,
 
 903 F.3d 166
 
 , 182 (2d Cir. 2018). It could be either the hypothetical, "ordinary case" conduct of the second interpretation or the case-specific, real-world conduct of the third.
 
 Compare
 

 Dugger v. Adams
 
 ,
 
 489 U.S. 401
 
 , 410 n.6,
 
 109 S.Ct. 1211
 
 ,
 
 103 L.Ed.2d 435
 
 (1989) (using "by its nature" to refer to general characteristics and not individualized circumstances),
 
 with
 

 H.J. Inc. v. Nw. Bell Tel. Co.
 
 ,
 
 492 U.S. 229
 
 , 241-42,
 
 109 S.Ct. 2893
 
 ,
 
 106 L.Ed.2d 195
 
 (1989) (noting that RICO continuity may be shown by "past conduct that
 
 by its nature
 
 projects into the future with a threat of repetition," and that this conduct "depends on the specific facts of each case" (emphasis added) ),
 
 and
 

 Doolan v. Carr
 
 ,
 
 125 U.S. 618
 
 , 625,
 
 8 S.Ct. 1228
 
 ,
 
 31 L.Ed. 844
 
 (1887) ("[E]ven a patent from the government of the United States, issued with all the forms of law, may be shown to be void by extrinsic evidence if it be such evidence as
 
 by its nature
 
 is capable of showing a want of authority for its issue." (emphasis added) ). Thus, the phrase "by its nature" does not resolve the meaning of "offense" one way or the other.
 

 Nor does the rest of the residual clause: "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Either hypothetical conduct or actual conduct may "involve substantial risk." Similarly, the predictive phrase "may be used" applies equally well to hypothetical or actual conduct. And the same is true of "in the course of committing the offense."
 

 Tellingly, the majority concedes that all the individual terms in the statute are susceptible to a case-specific interpretation. Somehow, it claims, the combination of words compels the "ordinary case" approach.
 
 See
 
 Majority Op. at 243-44. But a handful of maybe's simply do not add up to a never.
 

 III. Precedent Does Not Demand the "Ordinary Case" Approach
 

 The majority also claims that the Supreme Court has already resolved this issue by holding that the language used in Section 924(c)(3)(B) permits only one reading: the hypothetical conduct of an ordinary case. In so doing, the majority rewrites history. The Supreme Court has never held that the language like that in Section 924(c)(3)(B)
 
 necessarily
 
 requires the "ordinary case" analysis.
 

 The origins of the modern "ordinary case" approach lie in Supreme Court decisions interpreting statutory sentencing enhancements based on prior convictions for "violent felonies." Those decisions adopted a "categorical approach," requiring courts to look at the elements of the offense and not the defendant's conduct.
 
 See
 

 Shepard v. United States
 
 ,
 
 544 U.S. 13
 
 , 19,
 
 125 S.Ct. 1254
 
 ,
 
 161 L.Ed.2d 205
 
 (2005) ;
 
 Taylor v. United States
 
 ,
 
 495 U.S. 575
 
 , 600-02,
 
 110 S.Ct. 2143
 
 ,
 
 109 L.Ed.2d 607
 
 (1990). In addition to the text and practical considerations, one of the main motivators of the "categorical approach" was the need to avoid a potential Sixth Amendment problem: if a mandatory sentencing enhancement arose from the facts underlying a prior conviction, as opposed to the fact of conviction itself, then those facts could not be determined by a judge (absent a defendant's wavier).
 
 Shepard
 
 ,
 
 544 U.S. at 24
 
 ,
 
 125 S.Ct. 1254
 
 (plurality opinion). The importance of the Sixth Amendment to the history of the categorical approach is hardly controversial. The Supreme Court itself has directed courts to consider "the categorical approach's Sixth Amendment underpinnings" when applying it.
 
 Descamps
 
 ,
 
 570 U.S. at 269
 
 ,
 
 133 S.Ct. 2276
 
 . And multiple panel decisions by this Court have acknowledged as much.
 
 See, e.g.
 
 ,
 
 Price
 
 ,
 
 777 F.3d at 709-10
 
 .
 
 [5]
 

 Over time, the categorical approach was extended to new contexts. There are a
 number of statutes that mix and match similar language to define "crimes of violence" or "violent felonies." The language at issue in
 
 Taylor
 
 and
 
 Shepard
 
 , the classic cases, encompasses crimes that correspond to the "generic" definition of certain enumerated crimes. Other statutes include language resembling the "elements clause" of Section 924(c)(3)(A) and the "residual clause" of Section 924(c)(3)(B). Unsurprisingly, the Court transplanted the categorical approach into these similar contexts. Yet the Court continued to note the important Sixth Amendment problems that the categorical approach avoided.
 
 See
 

 James
 
 ,
 
 550 U.S. at 213-14
 
 ,
 
 127 S.Ct. 1586
 
 .
 

 The majority identifies only two cases suggesting that statutory text alone-unaccompanied by constitutional and other considerations-was sufficient to support the categorical approach. Neither is persuasive in interpreting the statute at hand. The first case,
 
 Leocal v. Ashcroft
 
 , only superficially supports the majority. After quoting language from the residual clause in
 
 18 U.S.C. § 16
 
 (b) (textually similar to the residual clause of Section 924(c)(3)(B) ), the Court stated: "[t]his language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime."
 
 543 U.S. 1
 
 , 7,
 
 125 S.Ct. 377
 
 ,
 
 160 L.Ed.2d 271
 
 (2004). Yet it is hardly surprising that the Supreme Court did not analyze the issue in detail: the parties, amici, and the Court accepted the application of the categorical approach as an untested premise before addressing the issue presented.
 
 Cf.
 

 Sessions v. Dimaya,
 
 --- U.S. ----,
 
 138 S.Ct. 1204
 
 , 1232,
 
 200 L.Ed.2d 549
 
 (2018) (Gorsuch, J., concurring in part and concurring in judgment) (accepting the "ordinary case" approach to Section 16(b) as a premise).
 

 As everyone accepted the categorical approach,
 
 Leocal
 
 had no reason to consider any saving constructions to avoid unconstitutionality (or constitutional doubts). So even were one to read
 
 Leocal
 
 as finding the "best" interpretation, that does not answer whether that is the only plausible interpretation. Moreover,
 
 Leocal
 
 addressed the application of Section 16 to prior convictions. It is in that context that applying a factual approach would raise the serious practical and Sixth Amendment concerns at issue in
 
 Taylor
 
 ,
 
 Shepard
 
 , and
 
 James
 
 . Section 924(c)(3) presents none of those problems, as it applies only to contemporaneous conduct. Nor did
 
 Leocal
 
 foresee that applying the "ordinary case" approach would be unconstitutionally vague under the Fifth Amendment. In fact,
 
 Leocal
 
 did not even use the term "ordinary case." In sum,
 
 Leocal
 
 's acceptance of an undisputed premise while interpreting a different statute in a different context without discussing the plausibility of a saving construction does not dictate the interpretation of Section 924(c)(3)(B).
 

 The second case,
 
 Dimaya
 
 , is even less supportive. It is true that Section IV(A) of Justice Kagan's opinion in
 
 Dimaya
 
 held that similar language demands the use of the categorical approach, but that interpretation was only endorsed by a plurality of the Supreme Court. Justice Gorsuch chose not to join that section of the opinion. Under the
 
 Marks
 
 rule, the binding holding of the Court is the narrowest opinion from those concurring in the judgment.
 
 Marks v. United States
 
 ,
 
 430 U.S. 188
 
 , 193,
 
 97 S.Ct. 990
 
 ,
 
 51 L.Ed.2d 260
 
 (1977). Thus, Justice Gorsuch's narrower concurrence controls. He (like the parties) simply assumed that the "ordinary case" approach applied, and on that basis held that § 16(b) is impermissibly vague.
 
 Dimaya
 
 , 138 S.Ct. at 1232-33 (Gorsuch, J., concurring in part and concurring in judgment).
 

 As for the debated language, Justice Gorsuch noted that "[p]lausibly, anyway,
 the word 'nature' might refer to an inevitable characteristic of the offense; one that would present itself automatically, whenever the statute is violated."
 
 Dimaya
 
 , 138 S.Ct. at 1233. He continued, "[w]hile I remain open to different arguments about our precedent and the proper reading of language like this, I would address them in another case, whether involving the INA or a different statute, where the parties have a chance to be heard and we might benefit from their learning."
 
 Id.
 
 Thus, Justice Gorsuch unambiguously stated that he is open to other interpretations, even involving the statute at issue in his own opinion. As his concurrence shows, the majority gets
 
 Dimaya
 
 backward.
 
 Dimaya
 
 makes clear that the interpretation of this language is a live issue before the Supreme Court, not one settled by precedent.
 

 If anything, the history of the categorical approach shows that the "ordinary case" approach should be jettisoned wherever possible. In truth, there is not one categorical approach; there are two. When the purely elements-based categorical approach from
 
 Taylor
 
 and
 
 Shepard
 
 was applied to residual clauses, it evolved (or perhaps devolved) into the "ordinary case" approach.
 
 See
 

 James
 
 ,
 
 550 U.S. at 208
 
 ,
 
 127 S.Ct. 1586
 
 . Those two approaches are only superficially similar. The elements-based approach looks only at the formal definition of the offense; the "ordinary case" approach tries to construct a hypothetical model of conduct for the offense. In both logic and application, they are as different from each other as they are from the case-specific approach. History has shown that the "ordinary case" approach is unworkable, so much so that its application has been declared unconstitutionally vague twice.
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2563 ;
 
 Dimaya
 
 , 138 S.Ct. at 1232-33 (Gorsuch, J., concurring in part and concurring in judgment).
 

 In contexts where the Sixth Amendment applies-in particular, mandatory sentencing enhancements for prior convictions-the "ordinary case" approach is the only way to interpret a residual clause. But in many contexts, those Sixth Amendment concerns do not apply. This is one of them: The consideration of contemporaneous conduct under Section 924(c)(3)(B) need not create any Sixth Amendment concerns.
 
 See
 
 Ante at 247-48 (Niemeyer, J., dissenting). And we have noted the importance of this distinction when rejecting specific applications of the categorical approach.
 
 Price
 
 ,
 
 777 F.3d at 709-10
 
 (noting, in rejecting the categorical approach, that "Sixth Amendment concerns that compel the judicial use of the categorical approach in other contexts are not present here"). When Sixth Amendment concerns do not apply, but Fifth Amendment vagueness concerns do, we
 
 must
 
 adopt the fact-specific interpretation.
 

 IV. The Majority's Remaining Arguments
 

 The majority advances a grab-bag of other considerations to support its "ordinary case" interpretation. Many of these are unpersuasive on their face, but I mention three briefly.
 

 First, the majority argues that adopting the factual approach to the residual clause would lead to a contradiction: "offense that is a felony" would be read to have a categorical interpretation in the elements clause, but a case-specific interpretation in the residual clause. Majority Op. at 242-43. This reasoning is hollow because, as I have already explained, there is not only one categorical approach. The hypothetical conduct of the "ordinary case" approach adopted by the majority differs substantially from the legal elements of the elements-based approach. Thus, the interpretation the majority adopts is similarly
 contradictory. And in any event, neither "contradiction" is that concerning.
 
 See
 

 Nijhawan
 
 ,
 
 557 U.S. at 37
 
 ,
 
 129 S.Ct. 2294
 
 (The "statute lists several of its 'offenses' in language that must refer to generic crimes ... [but] it lists certain other 'offenses' using language that almost certainly does not refer to generic crimes but refers to specific circumstances.").
 

 The majority also suggests that reading the residual clause to apply to real-world factual conduct violates the rule against surplusage by draining the phrase "by its nature" of any meaning. At the outset, the Supreme Court has explained that the rule against surplusage "is not absolute" and is itself to be avoided when it causes more problems than it solves.
 
 Lamie v. U.S. Trustee
 
 ,
 
 540 U.S. 526
 
 , 536,
 
 124 S.Ct. 1023
 
 ,
 
 157 L.Ed.2d 1024
 
 (2004). In any event, "by its nature" is not superfluous under the case-specific approach for two reasons. First, the phrase distinguishes subsection B's conduct-based residual clause from subsection A's elements clause. The latter addresses the legal elements of the offense ("has as an element"), while the former focuses more broadly on conduct (whether hypothetical or actual conduct).
 
 See
 

 Price
 
 ,
 
 777 F.3d at 708-09
 
 . Second, "by its nature" limits the residual clause to conduct that involves risk inherently or naturally, not merely incidentally or by happenstance. In this sense, the phrase "by its nature" acts as an intensifier that limits the clause's application to more dangerous crimes.
 

 Finally, the majority makes passing reference to the rule of lenity. Majority Op. at 250-51. The majority cites no authority for the proposition that the rule of lenity, grounded in the need for fair warning, demands that this Court knowingly adopt an interpretation so unclear that it is unconstitutionally vague. Indeed, this makes no sense.
 
 Cf.
 

 United States v. Lanier
 
 ,
 
 520 U.S. 259
 
 , 266,
 
 117 S.Ct. 1219
 
 ,
 
 137 L.Ed.2d 432
 
 (1997) (describing the "rule of lenity" as the "junior version of the vagueness doctrine" that "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered");
 
 United States v. Harriss
 
 ,
 
 347 U.S. 612
 
 , 617-18,
 
 74 S.Ct. 808
 
 ,
 
 98 L.Ed. 989
 
 (1954) (noting that while the Constitution "is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice," a court is under a "duty" to give a "reasonable construction of the statute" that makes the "class of offenses ... constitutionally definite"). It may well be that no ordinary person would be fairly warned that their conduct might be implicated by the hypothetical, "ordinary case" of robbery, but most everyone would understand that pistol whipping someone during an armed robbery is a crime of violence.
 
 [6]
 

 * * *
 

 Occasionally we find ourselves so far down the rabbit hole that logic appears upside down. It is true that the faithful application of the law may lead to odd results. And I certainly do not fault the majority for following its analysis to this seemingly nonsensical result. For good judges must be willing to reach results that go against their preferences when those results are dictated by principles or precedent.
 

 But judges are also required to exercise restraint. Voiding an act of Congress is an extraordinary exercise of judicial power, and accordingly, such power should only be invoked when it is incumbent upon us to do so. Here, the statute plausibly permits looking directly at Simms's conduct in pistol whipping a manager during a robbery in determining whether his conduct qualified as a crime of violence under the residual clause. We are therefore required to adopt that reading. For these reasons, I respectfully dissent.
 

 Gov. 28(j) letter at 2, ECF No. 44 (Oct. 19, 2016);
 
 see also, e.g.
 
 ,
 
 United States v. Prickett
 
 ,
 
 839 F.3d 697
 
 (8th Cir. 2016) ;
 
 United States v. Taylor
 
 ,
 
 814 F.3d 340
 
 , 378, 397 n.19 (6th Cir. 2016) ;
 
 United States v. Fuertes
 
 ,
 
 805 F.3d 485
 
 , 498 (4th Cir. 2015) ;
 
 United States v. McGuire
 
 ,
 
 706 F.3d 1333
 
 , 1336-37 (11th Cir. 2013) ;
 
 United States v. Serafin
 
 ,
 
 562 F.3d 1105
 
 , 1107 (10th Cir. 2009) ;
 
 United States v. Jennings
 
 ,
 
 195 F.3d 795
 
 , 797-98 (5th Cir. 1999) ;
 
 United States v. Kennedy
 
 ,
 
 133 F.3d 53
 
 , 56-57 (D.C. Cir. 1998) ;
 
 United States v. Amparo
 
 ,
 
 68 F.3d 1222
 
 , 1224 (9th Cir. 1995).
 

 One of my dissenting colleagues posits in a separate opinion that the ordinary-case approach "is not inherently 'narrower' than the case-specific approach" because "a judicially-imagined 'ordinary case' can ensnare a defendant whose actual conduct created no risk of violence, a result barred by the case-specific approach."
 
 Post
 
 , at 280-81n.6 (Richardson, J.). Whatever the merits of that contention in other contexts, it makes little sense in the context of Section 924(c)(1)(A).
 

 Put simply, my dissenting colleague's argument rests on the premise that a jury will find that a defendant did not, as a matter of fact, engage in conduct that posed a substantial risk of violence, even though the defendant necessarily (1) committed a crime that "ordinar[il]y" creates a substantial risk of violence and (2) committed that crime while carrying a firearm-"an article that is typically and characteristically dangerous,"
 
 McLaughlin v. United States
 
 ,
 
 476 U.S. 16
 
 , 17,
 
 106 S.Ct. 1677
 
 ,
 
 90 L.Ed.2d 15
 
 (1986), and therefore "inherently violent,"
 
 Pelissero v. Thompson
 
 ,
 
 170 F.3d 442
 
 , 447 (4th Cir. 1999). The prospect that a jury would render such a verdict is, indeed, vanishingly small.
 
 Cf.
 

 Smith v. United States
 
 ,
 
 508 U.S. 223
 
 , 240,
 
 113 S.Ct. 2050
 
 ,
 
 124 L.Ed.2d 138
 
 (1993) ("We therefore see no reason why Congress would have intended courts and juries applying § 924(c)(1) to draw a fine metaphysical distinction between a gun's role in a drug offense as a weapon and its role as an item of barter; it creates a grave possibility of violence and death in either capacity.").
 

 Rather, it is far more likely that a jury would find that an offense that is not "ordinar[il]y" a crime of violence amounts to a crime of violence when, in a particular case, the defendant committed the offense while carrying a firearm. In other words, the number of additional defendants convicted of violating Section 924(c)(1)(A) under the case-specific approach would likely substantially exceed the number of defendants-if any-who would be relieved of liability under that approach.
 

 Another one of my dissenting colleagues claims in his separate opinion that I "seek[ ] to replace the doctrine of constitutional avoidance with a search and destroy mission to strike down federal statutes."
 
 Post
 
 at 263 (Wilkinson, J.). Not true. My analysis leaves ample room for courts to rely on constitutional avoidance to adopt
 
 narrowing
 
 constructions of criminal statutes some applications of which pose constitutional concerns-that simply is not how my dissenting colleagues propose to apply the doctrine here. My dissenting colleague further asserts that my understanding of constitutional avoidance "embrace[s] the odd proposition that upholding a statute is somehow a usurpation of Congress' authority."
 
 Post
 
 at 263. Again, not true. I am not the first to recognize that-even when a
 
 limiting
 
 , as opposed to a
 
 widening
 
 , construction is proposed to save a potentially unconstitutional statute-courts do not "have the power, in order to uphold an enactment, to rewrite it."
 
 Skilling
 
 ,
 
 561 U.S. at 423
 
 ,
 
 130 S.Ct. 2896
 
 (Scalia, J., dissenting). That is particularly true given that, in the decades leading up to
 
 Dimaya
 
 , neither the government nor any court believed the case-specific approach applied.
 
 Cf.
 
 id.
 

 (explaining that "[i]f it were a 'fairly possible' or 'reasonable' construction, not 'contrary to the intent of Congress' "-and therefore amenable to application of the doctrine of constitutional avoidance-"one would think that
 
 some
 
 court would have adopted it"). In such circumstances, judicial "restraint" demands "resist[ing] the temptation to make all things right with the stroke of [the judicial] pen"-as my colleagues in dissent would have this Court do.
 
 Id.
 
 at 423-24,
 
 130 S.Ct. 2896
 
 .
 

 My friend Judge Wynn seeks to replace the doctrine of constitutional avoidance with a search and destroy mission to strike down federal statutes. He then proceeds to embrace the odd proposition that upholding a statute is somehow a usurpation of Congress' authority, and that interpreting a statute with due respect for the prerogatives of a coordinate branch is somehow an impermissible judicial exercise.
 

 It is further odd to suggest that an interpretation of a statute that allows triers of fact to apply its precise language to specific conduct represents a judicial "expansion" of an offense or indeed anything other than the most textually faithful rendering of the legislature's command.
 

 The majority attempts to distinguish
 
 Price
 
 on the basis that Section 924(c)(3)(B) 's residual clause lacks "conduct-specific language." Majority Op. at 245-46. Yet the majority has found that the residual clause demands adopting the "ordinary case" approach, an interpretation that focuses exclusively on hypothetical
 
 conduct
 
 .
 

 Even were the majority's distinction convincing, this would miss the point. Cases like
 
 Nijhawan
 
 ,
 
 Hayes
 
 , and
 
 Price
 
 reveal that the phrasing used here does not unavoidably refer to the "ordinary case" approach. It makes no difference whether the majority can find some linguistic distinction for each case, because a reading calling for the fact-specific approach need only be fairly possible.
 

 The majority downplays the importance of the Sixth Amendment concern, suggesting that these cases were only "secondarily informed" by nontextual considerations. Majority Op. at 240-41. That argument is ad hoc, running against uniform Supreme Court and circuit-level precedent to the contrary. Equally unconvincing is the majority's suggestion that, because the Court started with the text in these cases, the text alone must have been decisive.
 
 Id.
 
 at 239-40. The Supreme Court, like all courts, always starts from the text in statutory interpretation cases.
 
 See, e.g.
 
 ,
 
 Sebelius v. Cloer
 
 ,
 
 569 U.S. 369
 
 , 376,
 
 133 S.Ct. 1886
 
 ,
 
 185 L.Ed.2d 1003
 
 (2013).
 

 Judge Wynn suggests that the avoidance doctrine should allow only those interpretations that "narrow" a criminal statute.
 
 See
 
 Ante at 253-54 (Wynn, J., concurring). Even if one accepts this novel theory, the "ordinary case" approach is not inherently "narrower" than the case-specific approach. Since the "ordinary case" approach focuses on judicially-imagined hypothetical conduct in place of a defendant's own actions, that approach is both over- and under-inclusive. While
 
 some defendants
 
 would be guilty under the case-specific approach but not the "ordinary case" approach,
 
 other defendants
 
 would find themselves in the exact reverse position. These latter defendants, whose actual conduct did not create a substantial risk of violence, would be guilty when evaluated under the guise of a hypothetical ordinary case. Assuming it matters, I cannot as an empirical matter reasonably identify whether the former group is larger than the latter.
 
 Cf.
 

 Dimaya
 
 , 138 S.Ct. at 1232 (Gorsuch, J., concurring in part and concurring in judgment) (rhetorically asking whether "a conviction for witness tampering ordinarily involve[s] a threat to the kneecaps or just the promise of a bribe").
 

 Moreover, the concurrence's characterization of what it means to "expand" a statute's reach is perverse. A judicially-imagined "ordinary case" can ensnare a defendant whose actual conduct created no risk of violence, a result barred by the case-specific approach. It is the "ordinary case" approach that expands the statute to cover hypothetical conduct imagined by a court. And this is why the "ordinary case" approach is unconstitutionally vague. A far more precise approach is to let juries determine guilt based on the real actions taken by the defendant.
 
 See
 

 Harriss
 
 ,
 
 347 U.S. at 618
 
 ,
 
 74 S.Ct. 808
 
 (noting the duty to make the "class of offenses ... constitutionally definite"). It is entirely proper to replace an unworkable, unconstitutionally vague interpretation with a readily-comprehensible, textually-supported interpretation, even if that interpretation would "expand" liability by clarifying which conduct falls within the statute and which does not.